UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 05-426 (JNE/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Alden Randolph Banks, | |
| Defendant. | |

LeeAnn K. Bell, Assistant United States Attorney, for the Government.
Andrew H. Mohring, for Defendant.

___

**THIS MATTER** came before the undersigned United States Magistrate Judge on February 8, 2006, on Defendant's Motion to suppress evidence obtained as a result of 9/15/05 search and seizure [#36] and Defendant's Motion to suppress 9/15/05 statement [#37]. At the hearing, the Court received testimony from Corrections Agent Phillip Truax and Officer Darrel Seidel. The Government submitted two exhibits into evidence. Government's Exhibit Number One is a copy of the Minnesota Department of Corrections Conditions of Release for Alden Randolph Banks. Government's Exhibit Number Two is a audio recording of two statements made by Alden Randolph Banks to Officer Seidel. Defendant submitted one exhibit into evidence and that exhibit was the criminal complaint issued in the present case. This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends that Defendant's Motion to suppress evidence obtained as a result of 9/15/05 search and seizure [#36] be denied and that Defendant's Motion to suppress 9/15/05 statement [#37] be granted in part and denied in part.

## I. BACKGROUND

### A. Testimony of Corrections Agent Phillip Truax

Corrections Agent Phillip Truax ("Agent Truax") testified at the February 8, 2006, suppression hearing on this matter. Agent Truax testified that he works for the Minnesota Department of Corrections, and that he has been so employed for 29 years. Agent Truax testified that Defendant Alden Randolph Banks was under supervised release from prison, after he served a sentence for a violation of the Controlled Substance Act. Agent Truax testified that he was one of a team of four agents assigned to supervise Defendant while he was on supervised release, and that Agent Truax has supervised Defendant since Defendant's release from prison in August 2004.

Agent Truax testified that, on September 14, 2005, he received information from the Rochester Police Department that Defendant may have been involved in the illegal sale of narcotics. Agent Truax testified that the four agents assigned to supervise Defendant were meeting at the time the tip was received, and that the team decided to search Defendant's home the following day to determine if Defendant was violating his conditions of supervised release. Agent Truax testified that he did not get a search warrant to engage in the search of Defendant's premises. Agent Truax testified that he was authorized to search Defendant's residence based on condition number thirteen of Defendant's conditions of supervised release. Condition number thirteen states "The offender will submit at any time to an unannounced visit and/or search of the offender's person, vehicle or premise; by the agent/designee." (See Government Ex. 1.) Agent Truax testified that he contacted the Rochester Police Department to request their assistance with the search of Defendant's home, for the purposes of supplying extra security and additional expertise during the execution of the search. Agent Truax testified that he arrived at Defendant's home between 10:15 a.m. and 10:30

a.m. on September 15, 2005, and was accompanied by another corrections agent on the team assigned to Defendant, as well as Officer Seidel, another officer from the Rochester Police Department, an Olmsted County Deputy Sheriff and his narcotics sniffing canine.

Agent Truax testified that he had been to Defendant's home approximately ten times between Defendant's release in August 2004 and September 15, 2005. Agent Truax testified that Defendant lived in a secure apartment building and that the door to the apartment building was always locked. Agent Truax testified that a window in Defendant's apartment faced the street and the entrance of the apartment building. Agent Truax testified that, during his previous visits to Defendant's home, he would knock on Defendant's window in order to alert Defendant of his presence, and that Defendant would then let him in to the premises. Agent Truax testified that he and the other corrections agent followed this same procedure on September 15, 2005; that is, the corrections agents knocked on the window to get Defendant to open the door. Agent Truax testified that he had the other officers wait out of view of the window until Defendant let Agent Truax and his partner into the building. Once admitted, Agent Truax allowed the other four officers to enter the apartment building.

Agent Truax testified that Defendant's girlfriend and his girlfriend's minor brother were also in the apartment when Agent Truax and the other officers entered the premises. Agent Truax testified that, upon entering Defendant's apartment, he informed Defendant that the officers would be conducting a search of the residence to determine whether Defendant had violated any of the conditions of his supervised release. Agent Truax testified that the Olmsted County Deputy Sheriff asked everyone, including the other officers present, to exit the apartment building while his canine conducted a sniff search of the premises. Agent Truax testified that the Olmsted County Deputy

Sheriff led his canine through the apartment, and reported that, while the canine failed to positively alert to any areas in the apartment, there were several spots that peaked the canine's interest and that those spots should be investigated further. After the canine sniff was complete, Agent Truax testified that everyone went back inside the apartment, and that he asked Defendant if there were any drugs in the apartment. Defendant responded that there were not any drugs on the premises. Agent Truax testified that he went and searched the premises for a few minutes after Defendant denied the presence of narcotics on the premises.

Agent Truax testified that after searching the premises for a few minutes he returned to the living room and asked Defendant whether there was anything else in the apartment that may constitute a violation of his conditions of supervised release. Agent Truax testified that Defendant paused, and then informed Agent Truax that he was in possession of a firearm that was located in the closet off of his bedroom. Agent Truax testified that, at the time this statement was made, Defendant was not in handcuffs, because the officers had not yet found anything that would constitute a supervised release violation. Agent Truax testified that he did not give a <u>Miranda</u> warning to Defendant before asking him either question. Agent Truax testified that he and the female Rochester police officer went to Defendant's bedroom and searched his closet. Agent Truax testified that the female officer found a handgun in a gun case after a few minutes of searching the closet. Agent Truax testified that, during the time he and the female police officer searched the closet, Defendant and the two other persons present remained in the living room, where Officer Siedel also remained to maintain security of the situation.

After the firearm was located, Agent Truax testified that he walked into the living room and told Defendant he found the firearm. Agent Truax testified that he asked Defendant how he acquired

the firearm and Defendant stated that he acquired the firearm from his estranged wife. Agent Truax testified that Defendant stated that his estranged wife asked him to take the firearm out of her house, because she had children living with her and she did not want the children to be exposed to the firearm. Agent Truax testified that the female Rochester police officer took custody of the firearm because of her firearms training. Agent Truax testified that during the search of Defendant's residence alcohol and a small amount of marijuana were also discovered, and that possession of alcohol and narcotics are a violation of Defendant's conditions of supervised release. Agent Truax testified that he informed Defendant that the officers had uncovered enough evidence to justify a supervised release violation, and that Defendant was taken into custody at the end of the search. Agent Truax testified that the entire search, from entry to exit, lasted approximately one hour.

### B.   Testimony of Rochester Police Officer Darrel Seidel

Officer Darrel Seidel testified at the hearing on February 8, 2006. Officer Seidel testified that he is a police officer for the City of Rochester, and has been so employed for 21 years. Officer Seidel testified that he was present at the search of Defendant's residence on September 15, 2005. Officer Seidel testified that he heard Defendant make three separate incriminating statements on September 15, 2005.

Officer Seidel's testimony regarding the events of September 15, 2005, differed from the testimony of Agent Truax in several respects. First, unlike Agent Truax, Officer Seidel testified that the firearm was discovered prior to the Olmsted County Deputy Sheriff's canine sniff. Officer Seidel testified that he and Tracy Neper, the female Rochester Police Officer, Agent Truax and the other corrections agent were at the door at the time Defendant allowed Agent Truax to enter. Officer Seidel testified that once the four officers entered the premises, the three persons found therein were

confined to the living room. Officer Seidel testified that the corrections officers immediately commenced a search of the residence. Officer Seidel testified that while the corrections officers were searching the premises, Officer Seidel was busy admitting the Olmsted County Deputy Sheriff and his canine into the building. Officer Seidel testified that he did not know whether Officer Neper supervised the search conducted by the corrections officers. Officer Seidel testified that, at some point during that search, the three occupants were removed to the hallway of the apartment building, and that Officer Seidel accompanied the three individuals into the hallway. Officer Seidel testified that, while he was standing in the hallway near Defendant, he overheard the other officers talking about finding a firearm on the premises. Officer Seidel testified that he said, in a question directed to the other officers, "Who's gun is it?" to which Defendant immediately responded that the gun was his, that he received it from his ex-wife's house several months before. Officer Seidel testified that, at the time he made this statement, Defendant was not in handcuffs and was not under arrest at that time. This statement will hereinafter be referred to as Statement Number One.

Officer Seidel testified that after Defendant admitted that the firearm in the apartment was his, he was placed in handcuffs and was under arrest. Officer Seidel testified that, after the canine sniff was complete, Defendant and the other two occupants were taken back into the living room and told to sit on the couch. Officer Seidel testified that he took each person out of the living room into the hallway separately, and that he questioned each person in the hallway. Officer Seidel testified that he questioned the other two occupants of the apartment first, and then took Defendant, in handcuffs, out into the hallway for questioning.

Officer Seidel testified that approximately ten minutes elapsed between statement number one and Officer Seidel's subsequent questioning of Defendant in the hallway. At that time Officer

6

Seidel issued a Miranda warning to Defendant and informed Defendant that he could stop answering questions at anytime. Officer Seidel testified that he recorded the subsequent statement made by Defendant after he issued the Miranda warnings. Officer Seidel testified that Defendant stated that he understood the Miranda warnings and that he agreed to speak. Officer Seidel testified that Defendant never asked to stop the questioning, Defendant never asked for an attorney, and Defendant did not appear to be under the influence of any substance. Officer Seidel testified that the only physical interaction he had with Defendant was when he loosened Defendant's handcuffs in response to a request by Defendant. A copy of that statement was offered by the Government at the hearing as Government's Exhibit Number Two. This statement will be hereinafter referred to as Statement Number Two.

Officer Seidel testified that when Defendant was being placed in the squad car after the conclusion of the search of his residence, Defendant called Officer Seidel over to the car and asked Officer Seidel to come to the jail and talk to him. Officer Seidel testified that one and a half to two hours later he went to the jail and spoke further with Defendant. Officer Seidel testified that the statement that Defendant made at the jail was also recorded, and that a copy of that conversation was included in Government's Exhibit Number Two. Officer Seidel testified that he did not re-issue a Miranda warning to Defendant during their conversation at the jail. This statement will hereinafter be referred to as Statement Number Three.

Defendant now moves to suppress the statements made by Defendant on September 15, 2005 [#37] and to suppress the evidence obtained as a result of the September 15, 2005, search and seizure [#36]. For the reasons that follow, the Court recommends that Defendant's motion suppress the statements made by Defendant on September 15, 2005 [#37] be granted in part and denied in part,

and that Defendant's motion to suppress the evidence obtained as a result of the September 15, 2005, search and seizure [#36] be denied.

## II.   CONCLUSIONS OF LAW

**A.   Defendant Was In Custody As Soon As the Law Enforcement Officers Entered His Apartment Building; Therefore, Any Statements Defendant Made Prior To Being Issued a <u>Miranda</u> Warning Must Be Suppressed.**

Pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), "an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir.1990). Any statements taken in violation of this directive are subject to suppression. <u>Miranda</u>, 384 U.S. at 476. Voluntary statements by a suspect not in custody, however, do not require the protection of <u>Miranda</u>. <u>Id.</u> at 478-79. Thus, warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977); <u>United States v. LeBrun</u>, 363 F.3d 715, 720-21 (8th Cir.2004).

A person is "in custody" for <u>Miranda</u> purposes if the person is either under "formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." <u>Griffin</u>, 922 F.2d at 1347 (emphasis in original); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 428 (1984). The Court examines the extent of the physical or psychological restraints placed on the suspect during interrogation "in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." <u>Griffin</u>, 922 F.2d at 1347 (quoting <u>Berkemer</u>, 468 U.S. at 442.) The test is to be applied objectively: if, under the circumstances of a particular case, the suspect believes his freedom has been curtailed to the same extent an arrest

8

would have curtailed it, and if the suspect's belief is reasonable, then the suspect is in custody. Griffin, 922 F.2d at 1347; (citing California v. Beheler, 463 U.S. 1121, 1125 (1983); Berkemer, 468 U.S. at 440.) A determination of custody can only be reached upon considering the totality of the circumstances. United States v.Axsom, 289 F.3d 496, 500 (8th Cir.2002).

The relevant factors to be considered in making a determination of custody include:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349.

In order to issue a finding of custody a Court need not find that all of the above six factors are met. Griffin, 922 F.2d at 1349 (citing United States v. Longbehn, 850 F.2d 450, 452-53 (8th Cir.1988)). The first three factors are characterized as mitigating factors, so that the presence of one or more of these factors tends to mitigate the conclusion that a person was in custody at the time they were questioned. Griffin, 922 F.2d at 1349. Conversely, the last three factors are characterized as aggravating factors, so that the presence of one or more of these factors weighs in favor of a finding of custody at the time of questioning. Id. When balancing these factors, "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." Id. (citing South Dakota v. Long, 465 F.2d 65, 70 (8th Cir.1972)).

In the present case, a reasonable person in Defendant's position would have understood his situation to be one of custody. See Griffin, 922 F.2d at 1347 (quoting Berkemer, 468 U.S. at 442.)

9

Looking at the Griffin factors, Defendant was not informed at the time of the questioning, prior to being given a Miranda warning by Officer Seidel, that the questioning was voluntary, that he was free to leave or request the officers to do so, or that he was not considered to be under arrest. Defendant did not possess unrestrained movement while the law enforcement officers were in his apartment, as the officers controlled his movements within the residence and directed him to remain in the hallway while the canine sniff was taking place. In the present case Defendant did not initiate contact with the authorities; however, he did voluntarily answer the questions of Agent Truax and Officer Seidel.[1] In the present case, there was no testimony offered that the law enforcement officers engaged in strong arm tactics or employed deceptive stratagems during the questioning. However, the atmosphere of the questioning was police dominated, as there were five law enforcement officials and one canine present in the apartment at the time the statements were made. Finally, Defendant was placed under arrest at the conclusion of the questioning. Looking at the totality of the circumstances in the present case, the Court concludes that Defendant was in custody at the time he made statements to Agent Truax and at the time he responded to Officer Seidel's question asking who's gun had been found.

---

[1] The Court notes that there were several inconsistencies in the testimony of Agent Truax and Officer Siedel. The chief inconsistency in their individual testimony at the suppression hearing was whether Agent Truax located the firearm in the closet after being told about its whereabouts by Defendant, or whether the corrections agents discovered the firearm previous to the conclusion of the canine sniff and came out and stated that they had found a gun, to which Officer Seidel asked "Who's gun is it?" and Defendant responded "It's my gun." However, the inconsistencies in the testimony of the Government's witnesses are not material because the Court holds that Defendant was in custody as soon as the law enforcement officers entered the premises, and that anything that Defendant said previous to being issued a Miranda warning should be suppressed. Therefore, there is no need for the Court to resolve the differences in the conflicting testimony of the Government's witnesses, because the Court holds that Defendant was in custody at the time law enforcement entered the apartment.

To the extent that the Government argues that Officer Seidel did not subject Defendant to interrogation when he posited the question "Who's gun is it?" because Officer Seidel testified that the question was directed at other law enforcement officers, the Court rejects this argument. The Supreme Court has stated that the term interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). The Supreme Court stated that "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect amounts to interrogation." Id. at 302. In the present case, Officer Seidel was in the hallway standing near Defendant when he asked "Who's gun is it?" Officer Seidel should have known that it was reasonably likely that such a question, asked when Officer Seidel was in near proximity to Defendant, was reasonably likely to evoke an incriminating response from Defendant such that the question by Officer Seidel amounts to interrogation.

Therefore, since Defendant was in custody from the moment that the law enforcement officers entered his apartment, and since he was subjected to interrogation by Agent Truax and by Officer Seidel, and since that interrogation was conducted before Defendant was issued a Miranda warning, the Court recommends that the statements that Defendant made to Agent Truax, and Defendant's first statement to Officer Seidel, be suppressed.

   **B.** **The Statements Defendant Made to Officer Seidel After Being Issued a Miranda Warning Are Admissible Pursuant to Oregon v. Elstad.**

In the present case, after Officer Seidel heard Defendant admit that the firearm in the apartment was his, Officer Seidel testified that he placed Defendant in handcuffs because he knew that Defendant was a felon and that it is a felony for a felon to be in possession of a firearm. Officer

11

Seidel testified that approximately ten minutes after Defendant made the statement that he was the owner of the firearm, Officer Seidel took Defendant into the hallway and began questioning Defendant. Officer Seidel testified that he issued a <u>Miranda</u> warning to Defendant at that time. Officer Seidel also recorded this conversation, and it is clear from this recording that Officer Seidel did in fact issue a <u>Miranda</u> warning to Defendant before continuing to question Defendant. After Officer Seidel obtained the second statement from Defendant, Defendant requested that Officer Seidel meet him down at the jail to continue their discussion. Officer Seidel went to the jail approximately one and a half to two hours after he obtained the second statement from Defendant. Officer Seidel also recorded this statement and he did not reissue the <u>Miranda</u> warning to Defendant at that time.

Under the Supreme Court's holding in <u>Oregon v. Elstad</u>, Defendant's statements to Officer Seidel after Officer Seidel administered the <u>Miranda</u> warning are admissible. 470 U.S. 298 (1985). In <u>Elstad</u>, two police officers went to the home of the defendant with a warrant for his arrest in connection with a burglary that occurred in the defendant's neighborhood. <u>Id</u>. at 300. The defendant's mother answered the door and led the officers to the defendant's room. <u>Id</u>. The two officers asked the defendant to get dressed and accompany them into his living room. <u>Id</u>. After the defendant was dressed and in the living room, one officer asked the defendant's mother to step into the kitchen, where he informed her that they had a warrant for her son's arrest. <u>Id</u>. at 300-301. While the defendant's mother was speaking to one officer, the other officer was with the defendant in the living room. <u>Id</u>. at 301. The officer stated that he told the defendant that he felt the defendant was involved in the burglary and that defendant told the officer that he was present at the scene of the burglary. <u>Id</u>. The officers then transported the defendant to the police station, where,

approximately one hour later, he was informed of his Miranda rights. Id. Defendant thereupon waived his Miranda rights and gave a full statement to the officers concerning his involvement in the burglary. At trial the defendant moved to suppress both of his statements, arguing that the statement he made at his home in response to questioning "let the cat out of the bag" and tainted the subsequent confession as "fruit of the poisonous tree." Id. at 302 (citations and quotations omitted).

The Supreme Court in Elstad held that the statement the defendant made at his home before being issued a Miranda warning was inadmissible, because the defendant was in custody and subject to interrogation. The Court granted certiorari to determine whether "the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." Id. at 303. The Court held

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

Id. at 309. The Court concluded

> that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

Id. at 314.

In the present case, both Agent Truax and Officer Seidel failed to inform Defendant of his

Miranda rights before he made incriminating statements to them.  However, these unwarned statements were not obtained through the use of " actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." Id. at 309.  Therefore, the mere fact that Defendant made two previous unwarned statements does not create a presumption of compulsion, and the subsequent administration of the Miranda warnings by Officer Seidel "should suffice to remove the conditions that precluded admission of the earlier statement." Id. at 314.  As the Supreme Court stated, when such circumstances are present, "the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." Id.

However, the Supreme Court's decision in Missouri v. Seibert, 524 U.S. 600 (2004) complicates the analysis in this case.  In Seibert, the Court was asked to determine the constitutionality of the "question first" interrogation technique.  The law enforcement officer in Seibert used a deliberate tactic of first questioning the suspect without a Miranda warning in order to elicit a confession from the suspect. Id. at 604-606.  Once the confession was obtained, the officer issued a Miranda warning to the suspect and repeated the questions that had already been answered by the suspect. Id.  When the suspect gave a different answer in the second round of questioning, the officer would refer to her earlier incriminating response and then the suspect would make an incriminating post-Miranda admission. Id. at 605.

The Supreme Court in Seibert held that under the circumstances presented in Seibert, the postwarning statement was inadmissible.  However, there was no majority opinion in Seibert.  The Seibert plurality

> fashioned a multifactor test for use in deciding whether statements made during continuing interrogations were admissible in light of belated Miranda warnings.

14

> Relevant factors to consider are the completeness and detail of the questions and answers in the first round of questioning, the degree to which the content of the rounds overlap, the timing and setting of the questioning, the continuing involvement of particular law enforcement personnel, and the degree to which later questions treated the second round as continuous as the first.

United States v. Briones, 390 F.3d 610, 613 (8th Cir.2004) (citing Seibert, 542 U.S. at 615). Justice Kennedy supplied the fifth vote necessary to create a majority in Seibert. The Eighth Circuit subsequently reviewed the Supreme Court opinion in Seibert and concluded that "[b]ecause Justice Kennedy relied on grounds narrower than those of the plurality, his opinion is of special significance." United States v. Briones, 390 F.3d 610, 613 (8th Cir.2004); see also United States v. Black Bear, 422 F.3d 658, 664 (8th Cir.2005) (citing Marks v. United States, 430 U.S. 188, 193 (1977) ("when no single rationale has the assent of five Justices, the holding is the position of the Justices who concurred in the judgment on the narrowest grounds.")

> In his concurrence, Justice Kennedy stated
>
> I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning. The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two step strategy was employed. If the deliberate two step strategy has been used, postwarning statements that are related to the substance of the prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S. at 622. The Eighth Circuit noted that

> For Justice Kennedy the key question is whether the police conduct was deliberately devised to obtain incriminating statements by circumventing *Miranda*. . . . In his view, the principles of *Oregon v. Elstad* . . . control when the police have not deliberately used separate interrogations to elicit incriminating statements through belated *Miranda* warnings. Under *Elstad*, statements made after a knowing and voluntary waiver of *Miranda* rights are admissible unless there were earlier unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will.

15

Briones, 390 F.3d at 613-14 (citations omitted). The Eighth Circuit has concluded that "the key to *Seibert* is whether the police officer's technique was a 'designed,' 'deliberate,' 'intentional,' or 'calculated' circumvention of *Miranda*." Black Bear, 422 F.3d at 664 (citing Seibert, 542 U.S. at 618-622 (Kennedy, J., concurring in judgment)).

The Court concludes from the holding of the Supreme Court in Seibert that a subsequent statement made by a defendant after Miranda warnings have been issued will be suppressed if the defendant was previously interrogated without waiving his Miranda rights but only if the Court finds a deliberate effort on the part of law enforcement to circumvent the protections of Miranda.

The present case presents a close and difficult question under Seibert. However, the Court concludes that the circumstances of this case do not support a conclusion that Agent Truax and Officer Seidel engaged in a deliberate effort to circumvent the protections of Miranda when they each separately questioned Defendant without informing him of his Miranda rights. Therefore, looking to Justice Kennedy's concurrence in Seibert for guidance, since the law enforcement officers did not deliberately use separate interrogations to elicit incriminating statements through belated Miranda warnings, Oregon v. Elstad controls in the present case. Pursuant to Elstad "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314. Therefore, since Defendant was given a Miranda warning after he made two separate voluntary but unwarned statements, the subsequent Miranda warning is sufficient to remove the conditions that precluded admission of the earlier statements. Therefore, statement number two and statement number three are admissible.

        **C.**    **The Evidence Obtained As A Result of the Search of Defendant's Residence on September 15, 2005, is Admissible.**

16

In his motion to suppress the evidence obtained as a result of the search of his residence on September 15, 2005, Defendant argues that the evidence should be suppressed because the searches and seizures were conducted without a warrant, without probable cause and lacking in any exigent circumstances. Defendant further argues that any consent to search given by Defendant or any other person was invalid as coerced or beyond that person's apparent authority.[2]

Defendant's Minnesota Department of Corrections Conditions of Release form states that "[t]he released offender shall remain under the authority of the Minnesota Department of Corrections subject to the following standard conditions of release . . . 13) The offender will submit at any time to an unannounced visit and/or search of the offender's person, vehicle or premise; by the agent/designee." (Government Ex. 1.) The Conditions of Release were signed by Defendant and by Agent Truax.

The Eighth Circuit has stated that "[p]robation, like incarceration, is a form of criminal sanction imposed by a court on an offender after a guilty verdict or plea." Rowe v. Lamb, 130 F.3d 812, 814 (8th Cir.1997) (citing Griffin v. Wisconsin, 483 U.S. 868, 874 (1987)). The Eighth Circuit has noted that "probationers do not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty properly dependent on observance of special probation restrictions . . . With probationers, there is a heightened need for close supervision of the convicted person's activities to

---

[2] At the suppression hearing on this matter, Defendant also argued that, since there is no definition of the word "premise" as that word is used in condition number thirteen, the term is overbroad and vague, and therefore, the evidence obtained as a result of the search pursuant to this overbroad and vague condition should be suppressed. The Court rejects this argument, because, whatever the word "premise" means, as it is used in condition number thirteen, that definition includes the residence of Defendant. Since the search was conducted in Defendant's residence, that search was clearly authorized by condition number thirteen.

protect society and the probationer himself." Id. (citing Griffin, 483 U.S. at 874; United States v. Kills Enemy, 3 F.3d 1201, 1203 (8th Cir.1993)). In Rowe the Eighth Circuit concluded that "[b]ecause the terms of [the defendant's] probation order provided that he was subject to a warrantless search of his home at any time by any law enforcement officer, and because that term was reasonable, Rowe had no Fourth Amendment right to be free from such a search." Id.

In the present case, Defendant was convicted of a controlled substance violation and sent to prison. After serving a portion of his prison sentence, Defendant was permitted to participate in the supervised release program. If Defendant was found to have violated his conditions of supervised release, he faced being sent back to prison to serve the remainder of his original sentence. (See Government Ex. 1.) ("[c]onviction of any misdemeanor, gross misdemeanor, or felony will result in a return to incarceration per Minn. Stat. 244.171, subd. 4(2).") Therefore, it is clear that a person on supervised release is at least as restricted as a person on probation, and that a person on supervised release does "not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty properly dependent on observance of special" supervised release conditions. Rowe, 130 F.3d at 814 (citing Griffin, 483 U.S. at 874; United States v. Kills Enemy, 3 F.3d 1201, 1203 (8th Cir.1993)). As with probationers, "there is a heightened need for close supervision of the convicted person's activities to protect society" and the person on supervised release. Id. Therefore, as in Rowe, where the conditions of supervised release provide that a releasee is subject to an unannounced search at any time of the offender's person, vehicle or premises, by that person's agent or designee, and where those conditions are reasonable, a person on supervised release has no Fourth Amendment right to be free from such a search.

In the present case, the search of Defendant's residence was initiated by Agent Truax, his

supervised release agent.  Although Agent Truax requested the assistance of the Rochester Police Department and the Olmsted County Sheriff, Agent Truax testified that he asked for their assistance in order to have additional security on the scene, because corrections agents are not permitted to carry weapons.  Agent Truax further testified that he invited the Rochester Police and Olmsted County Sheriff in order to utilize their expertise, since the allegations in this case concerned narcotics and the Rochester Police Department and the Olmsted County Sheriff's Department have expertise in the detection of narcotics.  Therefore, although other law enforcement officials were at the Defendant's residence, it was Agent Truax who initiated the search and, hence, this search was valid pursuant to Condition number 13 in Defendant's conditions of supervised release.  Since this search was valid pursuant to Condition number 13, and since this condition was reasonable, Defendant had no Fourth Amendment right to be free from such a search.  Since Defendant did not have a Fourth Amendment right to be free from such a search, the evidence seized pursuant to that search is admissible, and the Court recommends that Defendant's motion to suppress the evidence obtained as a result of the search of his residence on September 15, 2005, be denied.

### III.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to suppress evidence obtained as a result of 9/15/05 search and seizure [#36] be **DENIED**, that Defendant's Motion to suppress 9/15/05 statement [#37] be **GRANTED in part** and **DENIED in part**, and that all statements made by Defendant after he was issued a Miranda warning are admissible.

DATED: February 21, 2006                               s/ *Franklin L. Noel*
                                                                              FRANKLIN L. NOEL
                                                                              United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 10, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **March 10, 2006,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.